IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BENJAMIN A. R.,[1]     )
           )
     Plaintiff,  )
           )
vs.          )  Case No. 18-cv-1142-CJP[2]
           )
COMMISSIONER of SOCIAL  )
SECURITY,      )
           )
     Defendant. )

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) benefits pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff filed an application for disability benefits in November 2014, alleging disability as of September 25, 2013. After holding an evidentiary hearing, Administrative Law Judge (ALJ) Kevin R. Martin denied the application on December 10, 2015. (Tr. 22-36). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative

---

[1] In keeping with the court's recently adopted practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 11.

remedies were exhausted and a timely complaint was filed in this Court.

On June 26, 2017, Senior United States District Judge J. Phil Gilbert reversed the ruling of the ALJ and remanded to the Commissioner for rehearing and reconsideration of the evidence. After holding another evidentiary hearing, ALJ Martin denied the application again on January 24, 2018. (Tr. 1321-1346). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ did not adhere to 40 C.F.R. § 404.1505 when he failed to properly consider whether claimant was entitled to a closed period of disability.

2. The ALJ failed to obtain testimony from claimant regarding his subjective symptom allegations and erred in his credibility determination.

3. The ALJ did not adhere to 20 C.F.R. § 416.927 when he failed to accord adequate weight to the opinions of the claimant's physicians.

4. The ALJ erred in failing to identify the evidentiary basis of his assessment of plaintiff's residual functional capacity (RFC).

5. The ALJ erred by failing to account for moderate deficits of concentration, persistence, or pace in the RFC finding.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes and regulations. For these purposes, "disabled" means the

"inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. § 423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539

(7th Cir. 2003).   This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Martin followed the five-step analytical framework described above.   He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date.   The ALJ found that plaintiff had severe impairments of multiple trauma following a parachuting accident, including multiple lower extremity fractures; obesity; and adjustment disorder.

The ALJ found that plaintiff had the RFC to perform work at the sedentary exertional level, limited to occasional climbing of ramps and stairs; no climbing of ropes, ladders and scaffolding; occasional balancing, stooping, kneeling, crouching, and crawling; and occasional push/pull with the left lower extremity. He also had mental limitations in that he was restricted to understanding, remembering, and

carrying out simple instructions; only occasional interactions with coworkers and supervisors; only incidental interaction with the public; and only routine changes in the workplace. Based on the testimony of a vocational expert (VE), the ALJ concluded that plaintiff was not able to do his past work, but he was not disabled because he was able to do other jobs which exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

### 1.    Agency Forms

Plaintiff was born in October 1988 and was almost 25 years old on the alleged date of onset. (Tr. 203). Plaintiff was injured in a parachuting accident. (Tr. 1453). He was on active duty in the United States Army at the time of his injury. (Tr. 208).

In March 2015, plaintiff was medically discharged from the Army. (Tr. 177-179). He was living in Army barracks at Ft. Bragg, N.C. before discharge. He stated that he used a prescribed cane and a brace. (Tr. 1694). By July 2015, plaintiff had moved back to Illinois. He reported that about 2 to 3 days a week, he spent the majority of the day with his feet elevated because of pain, swelling, and fatigue. (Tr. 1688, 1708). He did household chores and cooked simple meals,

but tasks took him longer and he limited himself to 10 to 20 minute intervals of standing and resting. (Tr. 1690-1691, 1693). His pain also made him short-tempered and he exhibited socially isolative behavior. (Tr. 1692-1693).

### 2. Evidentiary Hearing

At the first evidentiary hearing in November 2015, plaintiff reported suffering from a pelvic fracture and fractures in both his legs in the accident. At the time, he still had daily pain and swelling in his left ankle, pelvis and knees. His condition was described as "traumatic arthritis." He used a knee brace if he was going to walk long distances. He could be on his feet for about an hour and could sit for about an hour before having to change positions. He took Naproxen. (Tr. 47-49).

Plaintiff had been diagnosed with anxiety and adjustment disorder. It was difficult for him to communicate or to "deal with day-to-day civilians." He also took Zoloft. (Tr. 50). Plaintiff testified that he usually spent about half the day with his legs elevated to reduce his pain and swelling, mostly occurring in one leg. (Tr. 50-51, 56). He tolerated riding an exercise bike once or twice a week, for thirty minutes maximum. (Tr. 52). Household chores took longer because he had to take breaks, but he could grocery shop, clean, wash dishes, and mow the lawn with a riding mower. (Tr. 51, 57). A VE also testified. As there is no issue as to his testimony, it will not be summarized.

At the second evidentiary hearing in December 2017, plaintiff reported getting married since the last hearing. The ALJ asked plaintiff specifically about whether he had a small child at home. After answering in the negative, plaintiff

reported having a daughter with his wife, along with a step daughter. (Tr. 1364-1365). The ALJ then limited testimony to the time subsequent to the previous hearing. The plaintiff testified that he still usually spent about half the day with his legs elevated to reduce his pain. (Tr. 1366-1367).

### 3. Medical Records

In September 2013, plaintiff suffered fractures of the pelvis, left transverse acetabular, right minimally displaced sacral, left minimally displaced medial plateau, left ankle, left foot fifth metatarsal, right knee minimally displaced proximal lateral tibia; diastasis of the sacroiliac (SI) joint; and a tear of the left anterior cruciate ligament (ACL).[3] He had surgery at University of North Carolina Hospital (UNC), consisting of open reduction and internal fixation of his fractures and diastasis. He wore a knee immobilizer on his left knee to treat the torn ACL. (Tr. 324-327, 332). He was in an inpatient rehabilitation unit until October 11, 2013. At discharge, his right knee was in an immobilizer and his left knee was in a hinged brace. He was in a wheelchair and weightbearing status was touchdown only on both legs. (Tr. 406-407). Plaintiff was then assigned to the Warrior Transition Battalion (WTB) on active duty, although he did not appear to have any actual duties.[4] (Tr. 238, 292).

---

[3] Diastasis is the "dislocation or separation of two normally attached bones between which there is no true joint," while a fracture is the "breaking of a part, especially a bone."
http://medical-dictionary.thefreedictionary.com/diastasis (last visited on March 26, 2019);
http://medical-dictionary.thefreedictionary.com/fracture (last visited on March 26, 2019).
[4] "The Warrior Transition Battalion, or WTB, was created to provide personal support to wounded Soldiers who require at least six months of rehabilitative care and complex medical management. The WTB closely resembles an Army "line" unit, with a professional chain of command and the

In December 2013, plaintiff was permitted to bear weight as tolerated and to begin physical therapy. However, he had persistent delayed union of the left ankle fracture, which required more surgery. (Tr. 415-416). An open reduction and internal fixation procedure and bone graft were performed in February 2014. (Tr. 417-419). He was permitted to bear weight in March 2014 and was to begin physical therapy. (Tr. 422).

On May 22, 2014, a doctor at UNC noted that he was walking without an assistive device. He had some soreness and pain in the ankle and some pain radiating down the back of his leg, but was otherwise making appropriate progress. The hardware was well-aligned with healing at the previous nonunion site. He was to continue to work on range of motion and continue activity as tolerated. (Tr. 423-424). In physical therapy, plaintiff completed upper extremity and lower extremity exercise with his therapist. He also attended a physical therapy session with his therapist at a local gym, where he completed upper extremity, lower extremity, and treadmill work. (Tr. 705, 889).

Plaintiff was treated at Womack Army Medical Center until early 2015. He received outpatient physical therapy there. He was evaluated by Dr. Huang in July 2014. He reported pain over the lateral aspect of the left ankle where he had bone grafting. He said he could stand for about 40 minutes and walk for about 2 to 3

integrated Army process that builds on the Army's strength of unit cohesion and teamwork so wounded Soldiers can focus on healing and transition back to the Army or to civilian status. . . . The Soldiers at the WTB have one mission—to heal."
https://www.tamc.amedd.army.mil/wtb/about_wtb.htm (last visited on March 29, 2019).

hours, with pain.   He also had pain and morning stiffness in the left hip and ankle; and constant aching in his left knee.   X-rays were done.   Dr. Huang noted that there were "multiple issues," including a persistent gap in the pelvic fracture and possible incomplete healing of the left fibula.   In addition, he sustained a ligamentous injury to his left knee which caused instability, but Dr. Huang deferred surgical intervention for this injury based on the outcome of other injuries.   (Tr. 772-775, 1975, 1978).   Dr. Huang saw plaintiff again after CT scans and MRI studies were done of his pelvis, knees and left ankle.   Dr. Huang concluded that there was damage to the lateral joint space of the right knee which presented a high risk of early onset of knee arthritis.   There was a tear of the ACL of the left knee; he recommended initial treatment of physical therapy and knee bracing.   The pelvic fracture showed enough healing that no further intervention was needed in the immediate future.   Joint space damage could be expected to result in hip pain and early arthritis.   The left SI joint disruption and pelvic diastasis could cause chronic pain.   In the left ankle, the fibula fracture showed insufficient healing.   There was an articular joint step-off and joint narrowing in the ankle joint itself, which made chronic ankle pain and early onset of arthritis likely.   (Tr. 744-745, 1978).

Subjectively, plaintiff reported that his left ankle was the most disabling injury of the ones he sustained.   With activity, plaintiff reported a pain level of 3 to 4 on a 10 point pain scale.   When walking, the pain score rose to a 6.   In the left hip, plaintiff rated his pain a 3, but with walking and standing, that score rose to a 6 as well.   In the right knee, he rated his pain a 3 or 4 when walking, but it troubled

him minimally otherwise. He stated that his left knee ached constantly and gave way when on his feet for more than 2 to 3 hours. He also reported swelling and subluxation. (Tr. 1975).

At a physical therapy evaluation on July 23, 2014, plaintiff indicated that he could "walk and stand for up [to] 2 hours at a time, after that he is limping 'pretty bad.'" He reported constant pain in his left ankle with weightbearing activities. He had moderate ankle edema and edema over the distal third of the left leg. His gait was antalgic. The motion in his left ankle had not improved, which was causing alterations in his gait and increased pain and discomfort. (Tr. 741-742). On July 25, 2014, it was noted that he walked slowly and had a limp. He was taking Tramadol for pain and said it was "somewhat effective." (Tr. 728).

Dr. Kenneth Nelson saw plaintiff in the orthopedic clinic at Womack in August 2014. Plaintiff complained of pain in his posterior left ankle. He had undergone "a great deal of physical therapy" but was still stiff. Dr. Nelson found tenderness to palpation along the Achilles tendon. X-rays showed traumatic arthritis in the left ankle. He prescribed Mobic and recommended 6 weeks of stretching exercises. Dr. Nelson doubted that plaintiff could return to full duty with the degree of ankle osteoarthritis that he had. (Tr. 720). In September, Dr. Nelson noted considerably less tenderness along plaintiff's left Achilles tendon. He prescribed Naproxen. (Tr. 676).

On August 22, 2014, Dr. Huang prescribed a brace for plaintiff's left knee because it was giving way on him. (Tr. 711-712). A left hip x-ray done in

September 2014 showed no hardware fracture, but there was lucency around the SI joint screw, described as suspicious for loosening. An x-ray of the left foot suggested incomplete union of a fifth metatarsal fracture. (Tr. 605-606). Dr. Huang further noted that due to daily instability, plaintiff was a candidate for ligamentous reconstruction for his left knee injury. Plaintiff stated that he wanted to avoid surgery as much as possible, and agreed to wear a brace. However, Dr. Huang noted that if the brace was ineffective in addressing knee instability, reconstructive surgery would be the recommended treatment. (Tr. 1987).

Plaintiff was diagnosed with left foot collapse and plantar fasciitis in November 2014. He was prescribed night splints and arch support, along with stretching exercises. (Tr. 652). Plaintiff also received mental health treatment at Womack, beginning in July 2014. Under the intake form question regarding current activities he enjoyed, plaintiff listed "being outside where its (sic) quiet, archery, shooting." (Tr. 2203). He attended regular counseling sessions with a social worker and was seen by a psychiatrist. (Tr. 453-540). On the first visit, he said that his case manager had been trying to get him to seek mental health services for a while. He reported being angry and having low tolerance for others. He could not tolerate crowds and felt overwhelmed. (Tr. 520). He was diagnosed as having adjustment disorder with anxiety and depressed mood. A psychiatrist started him on Zoloft in August 2014. (Tr. 477-479). He stopped going to counselling in October 2014 because he did not feel like it was benefitting him. (Tr. 485).

In a therapy note from August 2014, plaintiff reported planning to get his hunting license. (Tr. 509). In September, his therapist noted plaintiff claimed "hunting this weekend but reports was more irritating b/c others were in woods and being loud so deer would not come." (Tr. 2002). Plaintiff told an occupational therapist in October 2014 that he was not concerned with looking for work when he was discharged from the Army because he had a job waiting with his father's company. (Tr. 669). In December, his physical therapist noted he was "going hunting with WTB over weekend." (Tr. 889).

Plaintiff continued to report generally similar pain scale scores. (Tr. 1875-1876, 2189). The VA rated plaintiff as 90% disabled in March 2015. (Tr. 171). As part of his discharge from the Army, plaintiff filled out a "Comprehensive Transition Plan (CTP) Scrimmage Worksheet" in anticipation of his transition out of the Army. Plaintiff "challenged" himself to get his commercial driver's license, go hunting, and attend archery once a week. (Tr. 1078).

After his discharge from the Army in March 2015, plaintiff returned to Illinois. (Tr. 1862, 4297). He received primary health care through the Effingham Illinois Community Based Outpatient Clinic, which is affiliated with the VA Medical Center in Marion, Illinois. (Tr. 1264-1264). Dr. Lizzette Colon was his primary care physician. In March 2015, she saw him for the first time. He complained of leg cramps and pain in his knees, ankles, and hips. He denied depression and anxiety. On exam, she found no pedal edema, normal range of motion, and no joint swelling in the extremities. His gait was normal. He weighed

226 pounds and was 70 inches tall. She prescribed Naproxen for his hip pain. He declined a referral for mental health treatment, but agreed to continue taking Zoloft. (Tr. 1270-1275).

In June 2015, acting as a state agency consultant, Dr. Richard Lee Smith, assessed plaintiff's RFC based on a review of the file materials. He found that plaintiff continued to have a limited range of motion in his left ankle along with pain. He concluded that plaintiff was limited to light work with the ability to occasionally climb, balance, stoop, kneel, crouch, and crawl, and that he could occasionally use his left leg to push or pull. (Tr. 80-81, 84). In August 2015, acting as a state agency consultant, Dr. Michael Nenaber also assessed plaintiff's RFC based on a review of the file contents and agreed with Dr. Smith's assessment. (Tr. 96-97, 100).

Dr. Colon saw plaintiff again in August 2015. Plaintiff reported aggravating factors of walking for approximately 300 feet, static standing, static sitting, and left leg weakness. He also reported that his left knee buckled when standing and walking occasionally. (Tr. 4176). Dr. Colon's findings on physical exam were all normal. She filled out an RFC report for plaintiff's social security application. According to Dr. Colon, plaintiff had a mild antalgic gait and limited range of motion of the left ankle, left hip and right knee. He had some weakness of the left ankle, knee and hip, with chronic pain of the lower extremities and "decreased tolerance for sitting or standing activities." (Tr. 1204-1295). She also indicated that plaintiff would need to take extra breaks during the workday and would likely

be absent from work about 3 times a month. (Tr. 1258-1260).

Dr. Vittal Chapa performed a consultative physical exam in April 2015. He found that plaintiff had decreased range of motion of the left ankle and muscle atrophy in the left leg. He was wearing a brace on his left knee. He had internal derangement of the left knee. (Tr. 1219-1224).

Jerry Boyd, Ph.D., performed a consultative psychological exam in April 2015. Plaintiff acknowledged anxiety or agitation symptoms, claiming that he got hot and sweaty when he had to "deal with - stupid people, fat people." Dr. Boyd concluded that plaintiff was able to understand, carry out, and remember both complex and one-two step instructions, but he had temper/frustration issues and his chronic pain condition would be expected to interfere with persistence and cause a reduced stress tolerance. (Tr. 1214-1217).[5]

In March 2016, plaintiff began mental health treatment again, seeing Jeanne Holdren, APN and other mental health professionals at an outpatient clinic. (Tr. 4572). In an April assessment, plaintiff stated that he did not like people in general and found it irritating to be around other people. He also stated he was experiencing sleep issues, mostly due to pain. (Tr. 4716). Plaintiff was noted throughout his progress notes as having a flat affect and irritable mood. (Tr. 4710, 4719-4720). He continued to get angry and have anxiety regarding social interactions, exhibiting signs of social isolation to avoid them. (Tr. 4567, 4652,

---

[5] Dr. Boyd also stated that plaintiff reported receiving special education classes in high school, although this remains an unsettled fact based on reports to the contrary in other areas of the record. (Tr. 523, 1214, 2197, 2250).

4630). He also continued to complain of pain, stating that he had constant pain in his legs. (Tr. 4666, 4648, 4686). Plaintiff additionally reported that he continued exercising at a local gym, going so far as to say that he pushed himself and "hurts himself" in areas that were injured during the accident. (Tr. 4661). He later stated he was building a "home gym for more specialized training and avoid going to the public gym." (Tr. 4630).

Dr. Colon filled out an update to her original RFC report in June 2016, stating that her opinion of plaintiff's condition had not changed. (Tr. 4149-4150). In July 2016, Ms. Holdren completed a mental RFC. She diagnosed plaintiff as having adjustment disorder with anxious mood and disturbance in mood. She rated plaintiff at mildly limited in his ability to carry out activities of daily living. She also rated plaintiff as markedly limited in social functioning, meaning that plaintiff exhibited behaviors that are not acceptable in dealing with supervisors, co-workers, or the public. Additionally, she rated him moderately limited in concentration, persistence, or pace. (Tr. 4364-4365).

In August 2016, acting as a state agency consultant, Dr. Richard Lee Smith, assessed plaintiff's RFC based on a review of the file materials a second time. He noted that plaintiff continued to walk with a left knee brace. He concluded that plaintiff was limited to sedentary work with the ability to occasionally climb ramps, climb stairs, stoop, kneel, crouch, and crawl; and never climb ladders, ropes and scaffolds. He also opined that plaintiff had the unlimited ability to balance. (Tr. 1453, 1457). In November 2016, acting as a state agency consultant, Dr. Julio

Pardo also assessed plaintiff's RFC based on a review of the file contents and mostly agreed with Dr. Smith's assessment, but concluded that plaintiff could do light work. (Tr. 1468-1469 1472).

X-rays from January and March of 2017 revealed continuing problems related to injuries plaintiff sustained during the parachuting accident. Plaintiff's January 2017 hip x-ray showed a degenerative change along the medial aspect of the left ilium with degenerative change of the SI joints. It also displayed post-traumatic deformity of the left portion of the pubic symphysis with diastases of the pubic symphysis and slight superior positioning. (Tr. 4617). The x-ray of the pelvis showed many of the same problems, also highlighting asymmetry to the femoral head. (Tr. 4618). The x-ray of the ankle revealed mild edema with questionable small anterior ankle joint effusion and a mild post-traumatic arthritic change to the ankle joint. (Tr. 4620).

Plaintiff sought out non-VA orthopedic care with Dr. Didi Omiyi, MD and underwent more x-rays in March 2017. On physical examination, plaintiff did not have tenderness in his knees, ankle, or SI joint, but did have tenderness in his greater trochanter. X-ray results revealed a healing distal fibula and lateral malleolus along with post-traumatic arthritic and degenerative changes of the ankle joint. Dr. Omiyi recommended treatment with anti-inflammatory medications, injections, physical therapy, and bracing. (Tr. 4614-4615).

### 4.    State Agency Consultants' Mental RFC Assessments

In June 2015, acting as a state agency consultant, Phyllis Brister, Ph.D., assessed plaintiff's mental RFC based on a review of the file materials. She indicated that plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods. In the "additional explanation" section of the form, she said that "difficulty sustaining performance will limit him to simple operation of a routine and unskilled nature." (Tr. 82-83). In August 2015, acting as a state agency consultant, Joseph Mehr, Ph.D., assessed plaintiff's mental RFC based on a review of the file contents. He largely agreed with Dr. Brister's assessment of plaintiff's limited ability to maintain attention and concentration. (Tr. 97-99).

In August 2016 and November 2016, acting as state agency consultants, Linda Lanier, Ph.D. and Donald Henson, Ph.D., both agreed that plaintiff was not significantly limited in his ability to maintain attention and concentration for extended periods. (Tr. 1455, 1470). In the "additional explanation" section of the form, each consultant wrote that plaintiff "has attention and concentration necessary to persevere at and complete those operations for time periods usually expected in the work force." (Tr. 1455, 1471). They also each wrote that plaintiff "retains the capacity to adapt to simple changes in daily routines, and the capacity to be aware of and self-protective of common hazards." (Tr. 1456, 1471).

## Analysis

Plaintiff argues, again, that ALJ Martin erred in his credibility findings by misstating and misconstruing some of the evidence. And again, this Court finds that the ALJ has indeed committed error in this respect.

The credibility findings of an ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

SSR 16-3p requires the ALJ to consider a number of factors in assessing the claimant's symptoms, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 16-3p, 2017 WL 5180304. SSR 16-3p goes on to state that symptom evaluation is "not an examination of an individual's character." 2017 WL 5180304, at *2. "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously [they] will continue to assess the credibility of pain assertions by applicants, especially as

such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). Under this regulation, the ALJ is required to give "specific reasons" for his credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Ibid*. See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.") If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those. The ALJ's decision failed to meet these requirements credibility requirements before rejecting the subjective symptom allegations of plaintiff.

The ALJ focuses on several alleged inconsistencies in the record in an overall misguided attempt to discredit plaintiff. The most glaring example is the ALJ's questioning during the second evidentiary hearing. In an adversarial and cross-examining style, the ALJ prodded plaintiff on his family life, knowing that plaintiff had a child with his girlfriend and married her in quick succession. Likely understanding that plaintiff would be reluctant to reveal this information, he then used this reluctance as a sword against the plaintiff in his decision, impeaching plaintiff's character on a subject that has almost no relevance to this case. Contrary to the ALJ's understanding of these proceedings, a hearing to determine whether a plaintiff is entitled to disability benefits is not, and should not be, adversarial in nature. See *Cannon v. Harris*, 651 F.2d 513, 519 (7th Cir.

1981).

Continuing, the ALJ asserted in his decision that plaintiff was, contrary to his testimony, on active duty from the date of his injury until his discharge and somehow lied about it. (Tr. 1330). There is a difference between being on "active duty" and having "no duties," at least in the military. While on "active duty" in the WTB, plaintiff had one duty – to heal, and that is readily apparent in the record.

Next, the ALJ focused in on certain hobbies plaintiff enjoyed. Plaintiff reported his intention to get a deer hunting license in late summer 2014. However, there is no evidence in the record to support the contention that plaintiff went deer hunting twice a month that season. There is, in fact, only some evidence to support that he went deer hunting once, with no description of the means by which he did so or the duration of the hunt. He also once stated that he *intended* to go hunting another weekend with WTB. What the ALJ does cite to support his contention that plaintiff hunted all the time, and in what he seems certain is a strenuous activity that runs contrary to plaintiff's symptomatic claims, is a CTP scrimmage worksheet where plaintiff challenged himself to do certain activities, including hunting and archery, as part of the process of transitioning out of the Army.

Additionally, for a second time, the ALJ noted that plaintiff told an occupational therapy assistant at Womack that "he has a job waiting with hid dads [sic] company when he retires from the military [and] therefore is not concerned with looking for employment." (Tr. 1330, citing Tr. 669). Plaintiff made this

statement in October 2014, a little over a year after his accident. At the earlier hearing, he testified that he was referring to the factory where his father worked, not a company owned by his father, and that the jobs there were physical labor requiring ability to be on your feet all day and to lift 50 pounds consistently. (Tr. 54). It is difficult to understand what the ALJ meant by highlighting this statement. According to the ALJ, plaintiff is limited to sedentary work, so he could not do the job that was waiting for him at his father's factory. It is entirely unclear how making that statement in October 2014, when he was still recovering from his injuries, detracts from the credibility of his later statements. This type of analysis continues into other facets of plaintiff's life, including going to the gym – which was encouraged by his physical therapist – and even watching a puppy.

It is, of course, appropriate for the ALJ to consider daily activities when evaluating credibility, but "this must be done with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). The Seventh Circuit has called improper consideration of daily activities "a problem we have long bemoaned, in which administrative law judges have equated the ability to engage in some activities with an ability to work full-time, without a recognition that full-time work does not allow for the flexibility to work around periods of incapacitation." *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014).

The ALJ here misconstrued information and made attenuated connections between plaintiff's activities and his exertion level in an apparent attempt to dismiss the bulk of plaintiff's subjective symptom allegations. The erroneous credibility

determination requires remand. "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).

Reconsideration of plaintiff's credibility will also require another "fresh look" at the medical opinions and plaintiff's RFC, as well as whether plaintiff is at least entitled to a closed period of disability. *Pierce, Ibid.* It is therefore not necessary to analyze plaintiff's other points in detail. The Court nevertheless makes the following observations.

First, the ALJ also ignored and mischaracterized medical evidence in the record. The ALJ mischaracterized a discussion between Dr. Huang and plaintiff about ligamentous reconstructive surgery. He also did not include plaintiff's x-ray information from October 2013 and July 2014, nor did he include his CT Scan and MRI from the July either. Additionally, he did not discuss plaintiff's MRI that revealed a ruptured ACL from August 2015, or for that matter, very little information about plaintiff's problems with his ACL beyond reference to a ligamentous reconstructive surgery. While missing some of this information could very well be understood given the sheer size of the record in this case, the amount of overlooked evidence here, as well as the content, starts to point to cherry-picking that this Circuit has previously rejected. See, *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

Second, the ALJ stated that he gave "great weight" to the opinions of Drs.

Brister and Mehr concerning plaintiff's moderate difficulties in social functioning and in concentration, persistence, or pace. Based on a review of the medical records, including Dr. Boyd's report, Drs. Brister and Mehr opined that plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods. (Tr. 82, 98). More recently, Jeanette Holdren additionally found moderate difficulties in concentration, persistence, or pace. Although the ALJ gave Ms. Holdren's opinion little weight based on her finding of marked limitations in social functioning, it appears that he concurred in part with her opinion on concentration, persistence, and pace based on his agreement with the conclusion of similar opinions on this topic. The same could be said for Dr. Boyd.

The ALJ's RFC assessment and the hypothetical question posed to the VE must both incorporate all the limitations that are supported by the record. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). This is a well-established rule. See, *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009)(collecting cases). If the ALJ finds that a plaintiff has a moderate limitation in maintaining concentration, persistence, or pace, as he did here for the second time, that limitation must be accounted for in the hypothetical question posed to the VE. In most cases, limiting the plaintiff to simple, repetitive tasks or to unskilled work is not sufficient to account for moderate concentration difficulties. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). Here, despite giving weight to the professionals' opinions regarding plaintiff's mental RFC, the ALJ did not flesh out plaintiff's moderate limitation in maintaining pace in his RFC assessment or ask a

hypothetical question to the VE regarding the limitation.

Furthermore, while the ALJ concluded that the objective medical evidence indicated that plaintiff's impairments could reasonably be expected to cause his alleged symptoms, he also concluded that plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." The Seventh Circuit has called this language "even worse" than "meaningless boilerplate." See *Bjornson v. Astrue,* 671 F.3d 640, 645–46 (7th Cir. 2012); see also *Brindisi v. Barnhart,* 315 F.3d 783, 787–88 (7th Cir. 2003). On remand, the ALJ should be more vigilant in addressing these issues as well.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is REVERSED and REMANDED to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   April 1, 2019.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**